HENRY S. ROWAN v. THE UNION ARMS COMPANY, THE STATE BANK, AND SANDERSON BROTHERS & CO.

[IN CHANCERY.]

*Attachment Lien. Conditional Sale. Mortgage. Foreign Corporation. Jurisdiction.*

Where property is attached, and pending the attachment, is sold subject to the attachment lien, and after judgment is obtained, is sold to the same parties on execution, it is *held*, that the title acquired under the latter sale becomes the superior and paramount title.

The Union Arms Company purchased the machinery and other property in the armory buildings and yards connected therewith, in Windsor, Vermont, upon condition that the title to the property, should not pass to, or vest in the vendees, until payment by them of certain sums of money, and performance of certain stipulations specified. *Held*, that in view of all the terms of the agreement, this was a conditional sale and not a mortgage.

Where a party acquires a valid lien upon property by attachment, he may claim the aid of a court of equity to make the attachment available, if he has taken the proper measures to preserve and enforce it.

And his lien will be preserved by an order staying execution for this purpose, notwithstanding the provision of the statute (G. S. p. 303, secs. 94–5,) requiring execution to be issued within thirty days after judgment is rendered. *Aliter*, in some cases of execution on judgment rendered by default.

And where the difficulty to pursuing the legal remedy, consists of a claim to the property attached, by the conditional vendors of the same, and there is a dispute as to how much of the purchase money, if any, is unpaid, so that it is necessary for an accounting to be made by the vendors to determine what is so due, and a bill in chancery is brought by the attaching creditor to obtain such accounting, within ten days after the attachment is made, it cannot be urged as a bar to the accounting that the attaching creditor did not pay or tender to the vendors the residue of the purchase money, remaining unpaid, within ten days after the attachment, as required by the statute,(Acts of 1854, No. 12); as only the accounting can determine whether the conditional vendors have, or had at the time of the attachment, any claim upon the property attached, which it was necessary for the attaching creditor to discharge by payment or tender.

In such a suit, the court having jurisdiction over the subject matter, the orator is entitled to the accounting sought for, to settle the controversy between

---

Rowan *v.* Union Arms Co. et al.

---

him and the defendants as to the title or right to the property, notwithstanding one of the defendants is a foreign corporation, and did not appear and answer to the bill, and submit to the jurisdiction of the court.

APPEAL from the court of chancery. The case is fully stated in the opinion. The court of chancery, May Term, 1861, PIERPOINT, Ch., dismissed the bill *pro forma*, with costs. Appeal by the orator.

*Washburn & Marsh*, for the orator.

*Andrew Tracy* and *Peck & Colby*, for the State Bank, and Sanderson Brothers & Co.

This case was argued at the February Term, 1862, and reserved for consideration. At the present term, the opinion of the court was delivered by

KELLOGG, J. The orator on the 21st of June, 1858, being the assignee of the interest of the firm of Fox, Henderson & Co., in certain claims for damages growing out of certain alleged breaches of a contract for the manufacture and delivery of twenty-five thousand Minie rifles, originally made with that firm by the Robbins & Lawrence Company, and subsequently assumed by the Union Arms Company, commenced a suit in the county court of the county of Windsor, in the name of Charles Fox as surviving partner of that firm, against the Union Arms Company, declaring upon the said breaches, and the writ in this suit was returnable to the county court at its December Term, 1858. This writ was served on the same 21st of June, 1858, by attaching as the property of the Union Arms Company all the coal, charcoal, ashes, brick, square timber, machinery, hay-scales, cordwood, boards, pig iron, bloomed iron and scrap iron in the yards and buildings known as the Armory buildings formerly occupied by the Robbins & Lawrence Company, but more recently occupied by said Union Arms Company, at Windsor in this county. The suit having been entered in the county court at the December Term, 1858, judgment was thereupon rendered at that term

in favor of the plaintiff against the defendant for $149,203.51 damages, and $48.04 costs of suit, and execution upon said judgment was, by order of court, stayed until a final · decree should be made in the suit in chancery now under consideration. There was no appearance in behalf of the Union Arms Company in this suit at law. ' This suit in ·chancery was commenced on the 28th of June, 1858. Fox, Henderson & Co. had their place of business in London, and were principal contractors with the war department of the. British government for the manufacture and delivery of the said Minie rifles. The property now in controversy originally belonged to the Robbins & Lawrence Company, a corporation located and doing business at Windsor, and that corporation failed or became insolvent, and its business ceased, on the 28th of October, 1856. For some time previous to its failure, its principal business had been connected with the manufacture and delivery of Minie rifles under its contract with Fox, Henderson & Co., above referred to ; and at the time of its failure, it was largely indebted to the State Bank, a banking corporation located and doing business at Hartford, Connecticut, and also to the firm of Sanderson Brothers & Co., a partnership dealing in cast steel, and having its financial place of business at ·Sheffield' in England, and also having a commercial house or agency in Boston under the care and management of John B. Taft. The State Bank and the firm of Sanderson Brothers & Co., were among the attaching creditors of the Robbins & Lawrence Company at the time of the failure of that corporation, and their attachments covered the property of that corporation at Windsor, but were subject to two previous attachments thereon in favor of the Merchants' Bank of Boston, and to a previous attachment in favor of the Ashuelot Bank of Keene, New Hampshire, and were also concurrent with attachments made at the same time in suits commenced by several other creditors of the Robbins & Lawrence Company. At the time of its failure, that corporation was very deeply involved in debt and was hopelessly bankrupt. In February, 1857, a joint stock association was organized under the name of the Union Arms Company, as a

body corporate, pursuant to the requirements of the statute laws of the state of Connecticut, and its stockholders consisted of persons who were creditors of the Robbins & Lawrence corporation, or of the partnership firm of Robbins & Lawrence, which had been engaged in the same kind of business at Hartford, and under the same management, seems to have absorbed the capital and substance of the corporation whose location and place of business was at Windsor, and then to have become engulfed in bankruptcy to a deeper and more hopeless extent than the corporation itself; and the stockholders of this association appear, for the most part, to have held paid up shares which were allotted in representation or satisfaction of their respective debts against that corporation and partnership. The articles of association under which the Union Arms Company was formed declare the purposes for which this company was established to be "for the manufacturing of fire arms, machinery, and tools, and dealing in the same, and such articles and merchandize necessary and convenient for carrying on their business," and also declare that the corporation thereby formed is to be established and located at Hartford, but that "it is intended by the corporation to carry on their manufacturing also in Windsor, Vermont." The evidence leaves no doubt that the chief, if not the sole object proposed to be accomplished by the organization of this corporation was the resumption of the work on the contract for the twenty-five thousand Minie rifles originally made by the Robbins & Lawrence Company, with Fox, Henderson & Co., through or under some arrangement to be made with the attaching creditors of the Robbins & Lawrence Company. The Robbins & Lawrence Company, at a meeting of its stockholders held on the 27th of May, 1857, authorized conveyances transferring its real and personal estate to the Union Arms Company to be immediately executed, and to be delivered upon compliance by the latter with certain conditions, and appointed a committee of three persons, a majority of whom were to have full power to determine upon the fact of such compliance. Agreeably to the authority thus conferred, conveyances transferring the real and personal estate of the Rob-

bins & Lawrence Company, both at Windsor and Hartford, to the Union Arms Company, were executed on the 28th of May, 1857, and appear to have been delivered to the Union Arms Company about the 1st of July following,—a majority of the said committee having in the mean time determined that said company had complied with the conditions above referred to. In the instrument conveying the personal estate to the Union Arms Company, it is expressed that it is understood by the parties that said personal estate was incumbered by various liens, and that the said conveyance was made subject thereto. On the 30th of July, 1857, an agreement in writing was executed between the Union Arms Company of the first part, the said Fox, Henderson & Co., of the second part, and the orator of the third part, in which, after reciting the contracts or agreements made by the said Robbins & Lawrence Company and Robbins & Lawrence with the said Fox, Henderson & Co., for the manufacture and delivery of the said twenty-five thousand Minie rifles, and the transfer by the said Fox, Henderson & Co., to the orator, (who was a Colonel in the British army, and the agent and nominee of the War Department of the British Government,) of the securities held by said Fox, Henderson &. Co., on the estates and machinery of the said Robbins & Lawrence at Hartford and the estates of the said Robbins & Lawrence Company at Windsor, and that the said Union Arms Company had recently been incorporated for the purpose of resuming and carrying on the business of manufacturers of arms, which had been previously carried on, by the said Robbins & Lawrence Company and Robbins & Lawrence, at Windsor and Hartford, it was mutually agreed by the parties that the said Union Arms Company thereby adopted and bound themselves to the performance of the several contracts or agreements made by the said Robbins & Lawrence Company and Robbins & Lawrence with the said Fox, Henderson & Co., as aforesaid for the manufacture of the said twenty-five thousand Minie rifles, in like manner as if the same were therein repeated, subject only to such modifications as were thereby or might thereafter be. mutually agreed to be made therein. Judgments

Rowan *v.* Union Arms Co. et al.

having been obtained in the suits upon which the property of the Robbins & Lawrence Company was attached on the 28th of October, 1856, as above stated, the personal property of that company at Windsor was sold by the sheriff on the executions issued on those judgments, at a public sale on the 20th of August, 1857, to the State Bank, and Sanderson Brothers & Co., who jointly purchased the same for the purpose of protecting their own debts. At the time of this sale, the attachment in favor of the Ashuelot Bank was an existing incumbrance upon the property, as it was prior in time to the attachments made at the time of the failure of the Robbins & Lawrence Company. On the 21st of September, 1857, an agreement in writing was made between the State Bank and Sanderson Brothers & Co., of the one part and the Union Arms Company of the other part, in which it was, among other things, recited that the Union Arms Company had executed and delivered to the State Bank a promissory note of the same date for $39,324.77, which sum represented the amount of the indebtedness of the said Robbins & Lawrence Company to said bank, with the expenses incurred by the bank in and about the collection of the debt,—and also had executed and delivered to Sanderson Brothers & Co. a promissory note of the same date for $12,936.03, which sum represented the amount of the indebtedness of said Robbins & Lawrence Company to said Sanderson Brothers & Co., with the expenses incurred by said Sanderson Brothers & Co., in and about the collection of their debt,—each of these notes being negotiable, and payable on demand, with interest,—and it was thereby agreed, on the part of the State Bank and Sanderson Brothers & Co., that whenever the Union Arms Company should have fully paid to the State Bank and Sanderson Brothers & Co. both of these notes, and the debt due from the Robbins & Lawrence Company to the Ashuelot Bank, then the State Bank and Sanderson Brothers & Co. should and would quit-claim to Merrick W. Chapin of Hartford all right, title, and interest which the State Bank and Sanderson Brothers & Co. might have to such portion of the machinery and other property so purchased

by them at the sheriff's sale as aforesaid, as might be in exist-
ence and in the possession of the State Bank and Sanderson
Brothers & Co., in the condition it might then be in,—it being
expressly understood and agreed between the parties that the
property in said machinery and other property should not pass to
said Chapin until the full and complete payment of the said notes
and of the debt due to the Ashuelot Bank as aforesaid with
interest and costs, but should be and remain, until such payment,
the property of the State Bank and Sanderson Brothers & Co.,
as before the execution of said agreement, and that the State
Bank and Sanderson Brothers & Co., should only be holden to
the said agreement on the condition that the Union Arms Com-
pany should procure an insurance on the said property in sound
insurance companies to the amount of $50,000, for the benefit
of, and payable in cases of loss to, the State Bank and Sander-
son Brothers & Co., jointly, the premium on which insurance
was to be at all times promptly paid by the Union Arms Com-
pany. And it was further provided in this agreement that the
State Bank and Sanderson Brothers & Co., should preserve in
themselves by means of an agent the possession of all of said
property until the same should be delivered to said Chapin, and
that the appointment of such agent should be in the hands of the
State Bank and Sanderson Brothers & Co., and that such agent
should have full power at all times to inspect all the books of
accounts and bills payable and receivable of the Union Arms
Company and all manufactures, transfers, and sales of any of
said property, and of property arising in whole or in part from
the avails and proceeds of any of said property by said Union
Arms Company should be made with the consent of such agent,
and that he should receive all the proceeds of such sales and
transfers, and that so much thereof as in his best judgment was
not necessary for the Union Arms Company to have for the pay-
ment of laborers and mechanics, and for the purchase of stock,
he should apply to the payment of the said notes to the said
State Bank and Sanderson Brothers & Co., in proportion to the
amount due on each. This agreement was modified by a subse-

quent agreement in writing made between the same parties, bearing date the 19th of October, 1857, in which it was, among other things, provided that the Union Arms Company might go forward and use the machinery, stock, and tools bought at the sheriff's sale as above mentioned, and might forward from Windsor to Hartford, and make up and deliver to the purchasers thereof, any portions of such stock from time to time, as the same should be manufactured and ready for delivery, subject however to the condition that all sales of such property should be made by said Union Arms Company with the consent of the agent of said State Bank and Sanderson Brothers & Co., and that the proceeds of such sales should be paid to him according to the previous agreement,—the said State Bank and Sanderson Brothers & Co., reserving the right to stop all use and sales of said property by the Union Arms Company on the first or any subsequent violation of the said agreement touching the said sales and the proceeds thereof,—and it was further provided that all rifles accepted by the War Department of the British Government, for which the said Fox, Henderson & Co. were contractors, might be delivered to said government without the consent of said agent on condition that the proceeds thereof should all be paid over to said agent for said State Bank and Sanderson Brothers & Co. At the time of the making of each of these agreements, the said Chapin was a stockholder and director, and the President of the Union Arms Company, and by a writing under his hand, bearing date the 19th of October, 1857, he acknowledged that the assignment of the property comprised in the said agreement made between the State Bank and Sanderson Brothers & Co., of the one part and the Union Arms Company of the other part, bearing date the 21st of September, 1857, when made to him, was to be made, and the property therein comprised was to be held by him, in trust and for the benefit of the Union Arms Company, and to be assigned and disposed of as said company might direct. On the same 19th of October, 1857, an agreement in writing was made between the Union Arms Company of the one part, and the said Fox, Henderson & Co., of the second

part, and the orator of the third part, supplementary to that made between the same parties on the 31st of July, 1857, and giving additional powers to the orator, for himself and the said Fox, Henderson & Co., in respect to rescinding the said contracts for the manufacture and delivery of the rifles on the failure of said Union Arms Company to resume and complete the delivery of the rifles as stipulated and provided for in the said agreements bearing date on the 31st of July and 19th of October, 1857. Immediately after the execution of this supplementary contract, the Union Arms Company entered upon the work of manufacturing and delivering rifles for the purpose of carrying out and completing the contract originally made between the said Fox, Henderson & Co. and the Robbins & Lawrence company, and having resumed the work, continued and kept up regular deliveries of arms under that contract from that time until the month of April, 1858, when the deliveries were suspended and ceased altogether. During this period of time as the evidence tends to show, about six thousand rifles were delivered to the agents of the orator in New York under the contract, in the name and behalf of the Union Arms Company, and the drafts of the treasurer of that company drawn against these deliveries, to an amount exceeding $50,000, were approved by the orator and duly paid, on the account of the British Government, (for which the orator was the agent and representative in the matters arising from the said contract as aforesaid,) and the proceeds of these drafts were received by the State Bank. The money so received is claimed by that bank in its answer to have been expended, with a much larger sum, in the manufacture of the rifles so delivered " and certain other rifles " now in the possession of said bank; and the testimony shows that large advances were from time to time made by that bank, and that by means of these advances the work of manufacturing and delivering the rifles was mainly prosecuted. On the 21st of June, 1858, the orator, in the name of Charles Fox, the surviving partner of the said firm of Fox, Henderson & Co., commenced the suit in the Windsor County Court against the Union Arms Company, declaring upon

certain breaches by that company in respect to the said several contracts for the manufacture and delivery of the said rifles, and caused an attachment to be made thereon, and obtained the judgment· in said suit, upon which execution was stayed under an order of the county court, as has been before mentioned. It is admitted in the answer of the State Bank that this attachment was placed on property which was sold at the sheriff's sale on the 20th of August, 1857, and is referred to in the subsequent ·contracts as above mentioned, and the evidence in the case fully establishes this· fact. The orator claims that in equity he is entitled to a decree that the State Bank and Sanderson Brothers & Co. should account for all collateral security by them held for said several promissory notes executed by the Union Arms Company to them as above mentioned, and for all the avails thereof by them received, and should account for all moneys that have come into their hands from the avails of the sales and manufacture of said personal property received by them from the Union Arms Company, and generally, should account for every thing so by them received from any and all sources which ought in equity to be applied to the extinguishment of the said promissory notes ; and the orator also avers that the property so received and held by the State Bank and Sanderson Brothers & Co., as collateral security as aforesaid, and the avails thereof by them received, and the money by them received under the said several contracts between them and the Union Arms Company, are more than sufficient fully to pay and discharge the full amount of said several promissory notes and all other sums of money for which they hold the said property. The question which the case presents for consideration is, whether the orator is entitled to an interlocutory decree that the defendants, the State Bank and Sanderson Brothers & Co., shall account for their receipts and disbursements under the contracts between them and the Union Arms Company of the 21st of September and 19th of October, 1857. As against the defendant, the Union Arms Company, the orator's bill was taken as confessed for want of an appearance and answer.

The title to the property in controversy passed from the Robbins and Lawrence Company to the Union Arms Company under and by virtue of the conveyances bearing date on the 28th of May, 1857, but subject, according to the express terms of the conveyance to the liens arising from the several attachments which were then pending and in force thereon. Those conveyances appear to have been duly executed and delivered, and to have been acted upon by the parties. But when this property was sold by the sheriff on executions against the Robbins and Lawrence Company issued on the judgments recovered in the suits in which those attachments were made, the title acquired under the attachments and sheriff's sale became the superior and paramount title; and, although there might have been some expectation or lingering hope on the part of those interested in the fortunes of the Union Arms Company that this company would have the benefit of the purchase at the sheriff's sale, we are satisfied by the testimony that this expectation or hope was not justified or authorized by any act or expression on the part of the State Bank and Sanderson Brothers & Co., or of their agents or representatives; and that, as purchasers at the sheriff's sale, the State Bank and Sanderson Brothers & Co., took a clear and absolute title to the property, freed from any agreement in respect to defeasance, or from any understanding on that subject. The testimony of Pardee, Taft, and Wardner is abundantly conclusive upon that point, and in our judgment decisively outweighs the testimony of Robbins to the contrary. The rights which the Union Arms Company previously had in the property sold at the sheriff's sale were extinguished by that sale, and the rights which that company subsequently acquired to this property are to be referred to, and rest upon, the provisions of the contracts or agreements in writing made between that company and the State Bank and Sanderson Brothers & Co., bearing date on the 21st of September and 19th of October, 1857. Those contracts, so far as they provide for a transfer of the legal title to the property to Merrick W. Chapin, would under his acknowledgement of the trust as already mentioned, make

Rowan *v*. Union Arms Co. et al.

him merely a trustee for the Union Arms Company; and if the property had been conveyed to him under the provisions of those contracts, it would have been, while in his hands, the property of that Company. The provisions of the contract of the 21st of September, 1857, constitute an agreement on the part of the State Bank and Sanderson Brothers & Co., to convey the property to the Union Arms Company on the payment of certain sums of money and the performance of certain conditions by that company. The contract of the 19th of October, 1857, is merely supplementary to the other, and does not affect this leading feature of the former contract, although it modifies the terms of that contract in several essential particulars. Neither of these contracts contemplate that the general title to the property should pass to, or vest in, the Union Arms Company until payment and performance of the conditions as stipulated; and it is expressly provided that the title should not pass, but should be and remain in the defendants until such payment and performance. When all the terms of the agreement are taken together, we are unable to distinguish it from the ordinary case of a conditional sale, in which the title to the property sold does not pass from the vendor, nor vest in the vendee, until satisfaction or performance of the condition; and this view of the subject would exclude the claim of the orator that the State Bank and Sanderson Brothers & Co., were in fact mere mortgagees of this property, as between them and the Union Arms Company.

The statute has provided (Acts of 1854, p. 15, No. 12,) that in all cases of sales of personal property where payment of the purchase money is by the contract of sale made a condition precedent to the transfer of the title, and where the property has in pursuance of the contract passed into the possession of the vendee, and where the purchase money shall have been in part paid, any creditor of the vendee may attach, or levy his execution upon said property, and upon payment or tender, to the vendor, his agent or attorney, within ten days after such attachment, or levy of the residue of such purchase money remaining unpaid, may hold the said property discharged from the claim of such vendor

thereon.   The testimony in this case shows a satisfaction of each
of the conditions required by this statute  to authorize  or enable
a creditor of the Union Arms Company to attach, or levy upon,
the property in  controversy as the property of that company,—
that is to say, (1.) the property was sold to that company by the
State Bank and Sanderson Brothers & Co., by a conditional
sale,—the payment of the purchase money being by the contract
of sale made a condition precedent to the transfer of the title ;—
(2.) the property in pursuance of the contract of sale passed into
the possession of the Union Arms Company,—and (3.) a por-
tion of the purchase money to be paid under the contract was
paid.   Mr. Belknap, the President of the State Bank in his tes-
timony admits that, after deducting the interest on the advances ·
and expenses, from five to ten thousand dollars, has been received
by the State Bank and Sanderson Brothers & Co., which should
apply in payment of the notes specified in the contracts of the
21st of September and the 19th of October, 1857.   The Union
Arms Company consequently had an attachable interest in this
property under the provisions of the statute above referred to,
and the orator, by his ·attachment on the 21st of June, 1858,
acquired the right to assert, in equity, in respect to so much of
the property as was on hand at that date, any claim which the
Union Arms Company could assert to it.   This right would
enable him to make his attachment or levy available·or effectual,
by making payment or tender of the unpaid purchase money
agreeably to the provisions of the statute ; and he would be
entitled to stand in all the right of that company as between them
and the other defendants.

The inquiry then would arise whether the Union Arms Com-
pany had any rights in respect to this property, at the date of the
orator's attachment which it could enforce as between itself and
the other defendants, under the circumstances of the case as
shown by the proofs.   It is objected on the part of the other
defendants that the Union Arms Company was greatly in fault
in failing to perform material stipulations of the contract of con-
ditional sale, and in procuring the execution of that contract by

Rowan *v.* Union Arms Co. et al.

false representations of its ability to furnish capital and carry on the business of manufacturing rifles, and of the value of its contract with the British Government. We think that this objection loses its force when it is considered that the State Bank and Sanderson Brothers & Co., continued to act upon the contract of conditional sale after they became aware that the representations on the part of the Union Arms Company in respect to ability to go on with the business of manufacturing rifles and the value of the contract with the British Government were delusive and false, and after they must have had full knowledge of the real condition of that company and of the value of the rifle contracts. We also think that as payment and performance by that company according to the terms of the contract of conditional sale would vest in it the general title to the property, and as that contract appears to have been acted upon by the other defendants after having knowledge of the delusive and unreliable representations of which they now complain; the Union Arms Company had the same right at the time when the orator's attachment was made to tender payment or performance in satisfaction of the conditions of the contract of conditional sale which it had at the time of the making of the contract.

The orator attached the property as belonging to the Union Arms Company, by due process of law, after the business conducted in the name of that company had ceased, and has perfected his claim at law by obtaining a judgment against that company in the suit on which the attachment was made. He claims that the State Bank and Sanderson Brothers & Co., have, from the proceeds of the business, received more than the amount of their debts against the Union Arms Company, and that the property specified in the contract of conditional sale belongs to the Union Arms Company for this reason. This is the ground of the equity insisted on in the orator's bill, and it is at all points controverted by the answers of the State Bank and Sanderson Brothers & Co. No payment or tender of performance on the contract of conditional sale could be made by the orator until the sum remaining due to the State Bank and Sanderson Brothers

10

& Co., as specified in that contract is made certain, and this can only be done by an accounting between the parties to that contract of the results of the business therein specified. This accounting can be secured only by the intervention of a court of equity.

Does the orator stand in such a position as to be entitled to this intervention? For the reasons already assigned, we think that the orator by his attachment acquired such an interest in the property as gave him a valid lien upon it. In this state, a lien upon personal property is created by the attachment itself, and not, as in England and some of our sister states, by the delivery of the execution to the sheriff. Here the lien exists before the issuing of execution. If the orator acquired a lien upon the property by his attachment, he may claim the aid of a court of equity to make it available, if he has taken the proper measures to preserve and enforce it. By the provisions of the statute, (Comp. Stat. p. 283–4, § 83, 84,) personal property attached on mesne process is held to respond to the judgment rendered on such process for thirty days from the day on which the plaintiff shall first by law, without leave of the court, be entitled to an execution on the judgment, and unless taken in execution within that time, it is discharged from the attachment. When the orator's judgment against the Union Arms Company was rendered, the issuing of execution upon the judgment was stayed by order of the court until the making of the final decree in this suit in chancery. As there was no appearance for the defendant in that suit, this order is to be considered as made at the instance of the orator. The power of the court to make the order is unquestionable, as it is the prerogative of every court to regulate and control the issuing of its own process. We do not think that an order of court staying the issue of execution on a judgment rendered by default, at the instance of the creditor, could in any case aid in preserving the lien created by the attachment on the property attached, beyond the thirty days from the day on which the creditor would otherwise become entitled to an execution on the judgment, unless it was made for some

good reason, arising from the situation or condition of the property itself which would make it apparent that the issue and levy of an execution would be wholly ineffectual,—such as a controversy or dispute in respect to the title to the property attached, causing an inequitable or fraudulent obstruction or embarrassment in the further pursuit of the legal remedy. But when there is such a cause or reason for the making of an order staying the issue of execution, so that it becomes necessary to seek the aid of a court of equity to remove the doubt or difficulty in the way of pursuing the legal remedy, we think that such an order should be regarded as effective in preserving the lien ; and the creditor having pursued his suit at law to judgment should in such a case be regarded as entitled to the aid of a court of equity for the purpose of removing the obstruction or embarrassment in the pursuit of his further legal remedy on his judgment. If therefore, the lien of the orator's attachment was not otherwise lost, we regard it as being kept on foot and still existing under and by force of the order staying the issue of execution on his judgment.

But it is claimed on the part of the defendants who have answered, that as the provisions of the Act of 1854, (above referred to,) allowing the attachment of property held under a conditional sale, require that the attaching creditor shall, within ten days after the attachment, pay or tender to the vendor, the residue of the purchase money remaining unpaid, and as it is not claimed that any payment or tender or offer of any sum was made by the orator to the State Bank and Sanderson Brothers & Co., as or for the residue of the purchase money of the attached property due to them from the Union Arms Company under the contract of conditional sale as aforesaid and remaining unpaid, the right acquired by the orator under his attachment is lost, and he is not now in a condition to assert any valid lien · on the property under that attachment because of his failure to make such payment or tender. But the position of the orator is, that the price of this property, whether the contract under which it was held be considered one of conditional sale or of mortgage, has

been fully paid, and that the claims of the State Bank and Sanderson Brothers & Co., have been extinguished by the excess of their receipts over expenditures in the business of the Union Arms Company, and that, by the express terms of their contract with the Union Arms Company, that company was the equitable owner of the property when the attachment was made, and was entitled to an immediate transfer of the legal title. The orator could not tender any sum as a balance due on the contract of conditional sale until the amount was ascertained by the intervention of a court of equity; and the antagonism of the parties in interest is not more distinctly marked in respect to any feature of the controversy between them than it is in respect to the matters connected with the receipts of the State Bank and Sanderson Brothers & Co., from the business carried on in the name of the Union Arms Company. The orator, within ten days after the making of his attachment, commenced this suit for discovery, account, and relief, on the ground of his lien on the property under the attachment; and the result of the accounting can alone determine whether the State Bank and Sanderson Brothers & Co., have, or had at the time of the orator's attachment, any claim upon the property attached which it was necessary for the orator to discharge by payment or tender as required by the statute. This objection cannot, as we think, be urged as a bar to the accounting sought by the orator, for its whole force must depend upon the results of the accounting; and whether the provisions of the statute requiring a payment or tender of the residue of the purchase money to be made to the vendor within ten days are applicable to a case like this, is a point which does not appear to us as necessary now to be considered. We find no occasion to anticipate the results of the accounting, or the consequences which may follow from those results when ascertained.

It is further claimed on the part of the defendants who have answered that there is a practical difficulty in the ordering of an account between these defendants and the Union Arms Company, arising from the fact that the Union Arms Company is a foreign corporation, and that it has not appeared and submitted to the

jurisdiction of the court,—the bill having been taken as confessed by that company for non-appearance,—and it is urged that this company, being beyond the reach of the process of the court, cannot be compelled to go into an accounting with the other defendants, and that any decree which might be made in respect to the accounting would be inoperative as to this company, and could not conclude or affect its rights. Admitting all that is claimed on this point, it is to be considered that the question now in controversy is one between the orator and the other defendants as to the title or right to the property,—that the property which was attached is within this state, and is, in its own nature, subject to attachment and sale on execution, and that the orator acquired a specific lien upon it under his attachment,—and that the orator claims that under the contract between the Union Arms Company and the other defendants, the whole price of the property had been paid to those defendants, and that it was released from their claims previous to attachment, and that it was then the absolute property of that company. This claim can be established only by the taking of an account of the receipts and disbursements of the State Bank and Sanderson Brothers & Co., under the contracts between them and the Union Arms Company. The question of right or title to the property can be settled as between the orator and these defendants by the taking of this account, even though the Union Arms Company may not be bound by the proceeding or its results; and we think that the orator, having obtained a legal lien upon the property by virtue of his attachment, is entitled, according to the principles which control the exercise of the jurisdiction of courts of equity over the subject matter, to a decree for an accounting, for the purpose of having the question of the right or title to the property ascertained and determined as between him and these defendants.

As the result of these views, the decree of the chancellor, *pro forma* dismissing the orator's bill with costs to the defendants, the State Bank and Sanderson Brothers & Co., is reversed, and the case will be remitted to the court of chancery with a mandate

directing an interlocutory decree that these defendants account before a master for their receipts and disbursements under their contracts with the Union Arms Company of the 21st of September and the 19th of October, 1857, and also directing that, upon the coming in of the master's report, the cause shall be proceeded with in the usual course to a final decree.